The Saint Louis Brewery is a brewery located in Saint Louis, New York, United States.  The applicant has used the mark, Your Honor, for some time, but that has to be compared to the industry that it's in. Whether its use of the mark is significant relative to the industry that it's in. And that presumption, Your Honor, of use over a particular time was not actually invoked by the board below. They did not invoke the five year presumption. In fact, they disavowed using use for five years. They said that's not what they're going on. And our main objection on appeal is that the board below never addressed that threshold question of whether the word is primarily merely a surname. And primarily in the statute actually doesn't refer to the use of the term in the marketplace. It actually refers to the meaning of the word. Is it in the dictionary? Was it a surname of a founder, which it was in this case? That's what primarily means. And there was a recent decision by the board that I alerted the court to in my 28-J letter written by Susan Hightower, which really lays out exactly what we felt the board should have done in our case. I want to ask you a question because I'm a little confused by something you just said. Where you said that the PTAB didn't look at distinctiveness and just sort of focused on whether it was primarily merely a surname. But I don't think that's right. I think that the PTAB looked at distinctiveness, found that this was distinctive, and thus didn't have to look at whether this was primarily a surname because distinctiveness is an exception to whether something is primarily merely a surname. Yes, Your Honor, that's right. And what I meant to say is that the PTAB skipped over that thresholding inquiry of whether it's primarily merely a surname and didn't look at that. The board says you can't have a trademark on something that's primarily merely a surname except that you can have a trademark if that name has acquired distinctiveness, which means that it didn't have to consider whether it was primarily really a surname because it could look at whether it had acquired distinctiveness. And I understand you disagree with that. Your Honor, I respectfully disagree because as Susan Hightower held in this Olin case, she said that it is well established that those are separate considerations under the Trademark Act that you first have to determine, see if I can find it here. Yeah, it has in fact long been established, however, that whether a mark is primarily merely a surname and whether it has acquired secondary meaning are separate considerations under the Trademark Act. And the board never looked at that threshold consideration. And the reason that's so important is because if you don't look at whether it's a surname, then you have nothing to measure secondary meaning against. The stronger it is as a surname, the more descriptive an applied for mark is, and that's one of the reasons surnames are not allowed because they're really descriptive. The more descriptive a mark is, the greater the burden on the applicant to prove that there's secondary meaning. So if you have a very strong surname, the applicant has a greater burden to show that there's significant secondary meaning to justify a trademark in that surname. And yet the board never even addressed whether it's a surname, which it obviously is. It's not going to be in the dictionary. Do you think it assumed it's a surname? Or do you think it just said, well, regardless of whether it's a surname or not, I'm going to move on to the exception? Well, yeah, that's what they said. We need to address whether applicant's mark actually is primarily merely a surname because the Trademark Act explicitly provides that such a mark may be registered if it has acquired distinctiveness. So you're right. That's what they did. We don't need to address it. But you can't measure the secondary meaning unless you first address whether it's a surname and whether it's a strong surname. And so what's your response to the five-year presumption? Yes. Well, Your Honor, surprisingly, the board disavowed using that five-year presumption. That's not what they held on to. What's your response to the five-year presumption? My response is the five years did not change the public perception as to what that word Schlafly means. That Schlafly is such a strong surname, it has historical significance. There are many figures, in addition to Phyllis Schlafly, who have used that surname, that the five years of use by the applicant in the beer industry, where $200 billion a year are spent just in advertising, the beer industry, the applicant is just a drop in the bucket, and they never moved the public perception. And that's the critical test. Did the public perception of this word change a little bit because of applicants' activities? And there's no evidence that it did. If we were to look in a dictionary today, if we were looking at a dictionary 30 years from now, and we looked up the word Schlafly, we're not going to find its meaning as beer. It's not going to be there. No one is going to think Schlafly means beer. And that's another point that the board missed, is that even though applicant has used Schlafly in its products, when the use of the word is as a surname, that doesn't get them the trademark. It's still a surname. It's a surname that they put on beer bottles. But it's still a surname. They haven't shifted the perception where when someone says Schlafly, there are people who think beer. That's a bottle of beer. No, people still think Schlafly is somebody's name. It's difficult to spell. It's difficult to pronounce. I can speak to that personally. It has a look and feel of a surname. It's the surname of the co-founder of applicant. That never changed. And nothing the board cites here even addresses the issue of whether public perception has changed to think that Schlafly means beer rather than somebody's surname. And some of the things they cite here, they cite attempts. They cite attempts to change it. They cite public relations effort. Here we go. On page 15 of their decision, they say, well, Playboy referred to Schlafly as beer. USA Today and Washington Post and the Wall Street Journal, right? Right. Referred to it as Schlafly. But that doesn't mean public perception has changed. That just means there's some public relations effort. It's like a candidate running for office, and this is where the dollars come in, because the way the board's opinion is written, they say, well, they spent money doing this. Well, suppose someone said he spent $2 million running for public office. That's a lot of money. What about the statement in the opinion in appendix 21 where it says, the evidence shows that a segment of the public has taken note of applicants' goods under its mark and would view the designation Schlafly as an indicator of the source thereof, the goods being the Schlafly beer. Right. Would you contest that? I do. There's no evidence that a segment of the public has shifted its perception of that word away from it as a surname. There's no evidence at all, and the board doesn't sign any of it. There hasn't been that shift. It can't be. I mean, they'd have to spend billions of dollars to change that public perception, and it still may not change.  Schlafly is obviously a surname. So we had the case by this circuit in Earnhardt recently, which I cited in my 28-J letter. He's the famous race car driver, Dale Earnhardt, and they're trying to trademark Earnhardt Collection. And this circuit said, well, wait a minute. Earnhardt Collection is primarily merely a surname. Not only is Earnhardt primarily merely a surname, but even Earnhardt Collection is primarily merely a surname. You can't do it under federal law. And so I'm urging, you know, some fidelity to the statute, which, as the Earnhardt decision says, there's a good reason for this, because anyone who has his name should be able to go into business, should be able to start a restaurant, Schlafly Restaurant, without having a beer company, which may be owned by someone else at that point, come in and say, you can't call your restaurant Schlafly Restaurant because we own a trademark in Schlafly. There's a strong public interest. It goes back a long time. What about the fact that the goods that are designated for the trademark are limited to, if I remember this correctly, they're limited to beer and beer production? I could look it up. That's right. That's the category. You're right, Your Honor. That's the category of beer and, you know, ale and all that stuff. However, I'm confident that they would come in and protest Schlafly Restaurant. On the basis of likelihood of confusion. Well, or just using the mark. I mean, a restaurant could serve beer. They could object, you know, historical uses of Schlafly. Once you get that trademark in a name, then they've got the full power of the Lanham Act behind them. They already have the common law trademark. They do, Your Honor, but they don't have that full power of the federal law behind them, where they go into federal court and they get attorney's fees and damages and all the presumptions that go with that. The presumption is after five years, there is a great burden. This is the difficult part, I believe. Here it is, 20 years without objection. Well, we don't object to their using the name. We object to their getting a federal trademark and all that apparatus of the Lanham Act. Powerful. Very powerful. You know, injunctions and all that stuff. That's what we object to. We don't object to their using the name. We don't object to their trademarking Schlafly beer. The actual products they use. That's an irony in this case. They can protect everything they need to protect by getting other names. And they have gotten some other trademarks using Schlafly. But to just get a trademark in that surname, that is going to put in jeopardy all other uses and businesses that use that surname. Schlafly restaurant. Potentially even historical uses of Schlafly. Schlafly library, potentially. I mean, all that becomes, there's a cloud now hanging over that. Whether other people can properly use that or use their own name. Future Schlafly's. Whether they can open their own business using their own name because there's that trademark in Schlafly. And that's why that federal statute is there. I submit. I'd like to reserve the rest of my time for rebuttal. Okay. Thank you, Mr. Schlafly. Thank you. Mr. Sowers. Thank you, Your Honor. My name is Mark Sowers. I am here representing Pelley, the applicant, St. Louis Brewery LLC. The board's finding that applicants Mark Schlafly has acquired distinctiveness is supported by substantial evidence in the record. In fact, applicants submitted considerable evidence of acquired distinctiveness before the board in this proceeding. The board, in its decision determining that applicants Mark had acquired distinctiveness, spent almost seven pages detailing and going through all of the evidence applicants submitted with respect to the acquired distinctiveness of the term Schlafly with respect to beer. Again, some of this evidence is traditional evidence from which courts generally can find acquired distinctiveness. The length of use, quantity of sales, advertising expenditures, et cetera. But importantly, the applicant in this case also submitted context for the use of applicants Mark. For instance, in this particular case, the board cited the fact that the applicant had continuous exclusive use of the Mark for 20 years, not even substantially exclusive use. There's no evidence that anybody else anywhere used the term Schlafly related to beer or related products. Applicant uses its Mark and its beer products were sold in over 14,000 different retail establishments in 15 states and the District of Columbia. This includes places such as Walmart, Sam's, Costco, Target, and other large national retailers. It's sold in national restaurant chains, Chili's, Applebee's, Buffalo Wild Wings. It's sold in different sports stadiums in the Midwest. In addition, the board noted that applicant did have substantial sales in terms of revenue from 1999 through 2015. It also noted that applicant had over $1.1 million of advertising expenditures from 2009 to 2014. Importantly, the board noted the quantity of sales was substantial in this case as well. Applicant's evidence shows that from 2009 through 2014, it had over 75 million individual servings of its Schlafly brand beer sold in the United States. This includes over 16 million in 2013 and 2014 alone. And this evidence is particularly compelling when the court reviews in context of how applicant brands and promotes its products. The applicant made a decision many years ago to focus on the term Schlafly for its products. Applicant sells over 60 different varieties of beer. And as opposed to many breweries which have a particular trade name or arbitrary name or fanciful name for each individual variety, Schlafly only uses the term Schlafly for each variety. So whether it's a pale ale or pumpkin ale or hefeweizen, it's Schlafly pale ale, Schlafly hefeweizen, Schlafly pumpkin ale. And why that's significant with respect to individual servings is because when a consumer goes in and wants to order a Schlafly brand product, they can't simply order a pale ale. They actually have to use and say, I'd like a Schlafly pale ale, I'd like a Schlafly hefeweizen, et cetera. In addition, as the evidence that was submitted of record shows, not only do consumers have to actually use the trademark Schlafly in order to order one of these 75 million individual samples, but when they receive it at the store or in their six-pack or in their can or bottles, the term Schlafly is prominently displayed on the six-packs, on the labels, on the can, on the bottle caps. And in fact, applicant developed its own font just for the term Schlafly because it knew that in order to compete in this market, in order to garner consumer recognition of its name, it had to focus solely on developing and acquiring distinctness in that term Schlafly. So it's always been held apart and distinct from any other font. And they've always promoted that word Schlafly, that trademark, in order to sell and promote its products. In addition to that evidence, applicants submitted, again, quite a bit of evidence of third-party recognition of its mark. And this third-party recognition includes awards, but it also includes unsolicited media recognition. Again, as the court has noted, in major national publications, the Wall Street Journal, the Washington Post, USA Today, Men's Journal, Atlantic, Esquire, et cetera. And significantly, and the board took note of this, in many of these third-party references to not only Schlafly beer, but also to the applicant, applicant's mark is so strong, actually, that parties conflate the applicant with its trademark. In fact, in 237-238 of the appendix, which is the list of the top 50 breweries in the United States from 2012, so this is all the way back in 2012, the Brewer's Association describes the applicant as the St. Louis brewery slash Schlafly beer. In fact, it's the only brewery on that list where they actually use the trademark to describe the applicant or the source of the actual beer. And so that evidence alone is sufficient for the board to find that applicant's mark has acquired distinctiveness. The opposer in this case, and he's made several allegations, that the board was findings without any evidence of public or consumer recognition of the mark. Of course, the board considered that argument in its ruling on the request for reconsideration and determined that, indeed, was not well taken. I think what the applicant's missing is that Section 2F, which is, indeed, the governing statute, which determines whether or not doesn't mention any type of evidence. In fact, it simply says that use of five years may constitute prima facie evidence of acquired distinctiveness. This court has expounded on that particular standard in Yamaha v. Oshino, where it basically said that in order to prove acquired distinctiveness, an applicant can submit any evidence tending to show a mark distinguishes applicants' goods. Of course, this principle is expounded upon by this court in Coach Services v. Triumph. There, the court lists some traditional evidence which may be considered in order to determine whether a mark has acquired distinctiveness. That's advertising expenditures, sales success, length of use, unsolicited media coverage. And all of this is exactly what applicants submitted before the board, and it's exactly what the board relied upon in order to find acquired distinctiveness. Opposer, in its brief, also makes the allegation and the assertion that in order to find acquired distinctiveness, the applicant was required to submit consumer service. That clearly is not the law. In fact, in Yamaha, this court explicitly says as much and says that consumer service are not required to find acquired distinctiveness. I think much of the opposer's arguments seem to conflate the issue of actual evidence with whether it's direct or circumstantial evidence. Any actual evidence of acquired distinctiveness is just evidence which would show or which is provative of whether applicants' mark has indeed acquired distinctiveness. And then actual evidence can be separated into circumstantial evidence or direct evidence. In this case, there's no question that applicants submitted a lot of circumstantial evidence from which the court can then infer that applicants' mark has become a source indicator for its products. In Tone Brothers, this court has found that circumstantial evidence alone is sufficient in order to find acquired distinctiveness. However, applicant also did submit direct evidence, and as the board noted, the direct evidence is all of the unsolicited third party references to applicants' mark. Finally, I would submit to the court that the board did not need to determine whether or not applicants' mark was primarily merely a surname. It was not required. The board did find that it had acquired distinctiveness, and therefore that analysis was not appropriate. In addition, applicants' mark was, when it was filed, was submitted under a claim of 2F in any event, which again would obviate the requirement that this court or the board would need to first determine whether or not a mark is a surname before moving on to acquired distinctiveness. I would reject the opposer's assertion that the recent case, Olin case, makes any such requirement that you first must determine whether a mark is a surname, and then determine whether it's acquired distinctiveness. That's not what that court holds. It just simply went through the surname analysis and found that since Olin was a surname, the only way that the applicant was entitled to registration was if it proved acquired distinctiveness. That's all that case stands for. We certainly don't dispute that whether a mark is a surname or a term is a surname and whether a term has acquired distinctiveness is two different analyses. Of course, that is a completely separate analysis under the statute and the Lanham Act. With respect to the allegation that the court then had to determine some level of descriptiveness of the mark, this is one area where I believe that the descriptiveness analogy that we typically apply to surname marks kind of breaks down. Traditional descriptive marks are marks in which the term immediately conveys some characteristic or quality of the underlying product to consumers. That's not what we have in surnames. The prohibition against surnames, in part, is not based upon the fact that the surname conveys some immediate quality or characteristic of the product. In surname registration, it's because a consumer would not immediately identify the term with a single source of the product. It would immediately identify the term as a surname. What it's really about is whether or not the consumer's recognition of the surname would interfere with the mark's ability to acquire distinctiveness. In this particular instance, the board did indeed consider the relative notoriety or prominence, to the extent it exists, of opposer surnames. In fact, on page 24 of the appendix in the last page of the board's decision, it acknowledged the fact that to the extent there is any relative notoriety or prominence of the name Schlafly, there was simply no evidence of record that that prominence or notoriety impacted at all the applicant's ability to acquire distinctiveness for the mark. To the extent that this analysis or allegation that you must first determine the level of descriptiveness for the mark and then move on to determine whether it's quite distinct, it breaks down in the surname context. However, I think functionally the court did that exact analysis and determined whether or not the prominence of the Schlafly surname impacted or interfered with the applicant's ability to acquire distinctiveness. The court determined no. It certainly did not. So in closing, I would suggest to the court that the board has relied on more than enough evidence in order for the court to uphold its finding that applicants' mark has acquired distinctiveness. I don't believe there's any requirement under the Lanham Act nor under the relevant case law that the court must first determine whether or not the mark determines the surname before moving on to acquire distinctiveness. And again, to the extent that there would be some requirement that the court determine the level of descriptiveness, I think the court functionally did that exact analysis by comparing and determining whether or not the alleged notoriety of individuals with the surname Schlafly had interfered in any way with applicants' acquired distinctiveness of the mark. Any questions? Thank you so much. Thank you. As to the five-year use, it was not used below. I mean, that's an evidentiary standard that the director may look to five-year use and consider that climate-facing evidence. The director did not do that, and the board did not do that. So I think the five years, because that's an evidentiary issue, would not be considered by this court. Mr. Schlafly, you said you have no objection to the continued use of the mark for these products? That's right. But we do object to their getting a trademark because that trademark will prevent. Well, that's really what you're objecting to, they're acquiring the legal rights that go with federal registration. Right. Is that right? What is the standing to raise that issue that some total stranger can't acquire legal rights? I hadn't seen in your briefs any statement of injury to the family by these legal rights. Just what is the objection? Well, of course, they haven't gotten it yet. We've objected, and they haven't gotten the federal trademark yet. But the board did address standing at length, and the standing would be if Bruce Schlafly wanted to start Schlafly Restaurant, he wouldn't be able to do that. He'd have a federal clause. You're objecting to something that hasn't yet happened? Well, they haven't gotten the trademark yet. And what about this trademark would inhibit someone else from opening a restaurant, with or without this trademark? I need to understand just your standing to come into court and say, I object to someone else, total stranger, we happen to have the same name, we happen to be related, acquiring a legal right. Because that legal right is very powerful. For Bruce Schlafly to open a Schlafly Restaurant, he would be taking— It's the goods are identified in the registration. I didn't see that they mentioned restaurants. No, but those goods are not—they're not limited to those goods when they use the full power of the Lanham Act to enforce their trademark rights. They're not limited to those goods. Are you sure? Oh, absolutely, yeah. They could come down against someone who opened Schlafly Restaurant and sue them for trademark violations, and they're very powerful. And so what is the standing of family members to come into court and object to things that haven't yet happened? Well, I mean, this—they haven't gotten the trademark yet. So we have to object. I mean, we have to object or we're going to waive it. The way the law works is if we don't raise our objection during that notice period, we don't object to their getting the registration. We waive our rights to it, so we have to object. But do you have Article III standing? Maybe you had standing before the trademark office. Right. But do you have standing—Article III standing before this court? We do, Your Honor, because when they—the trademark office rejected our opposition. We took it up on appeal, and then we got a decision on appeal by the board that is then appealable to this court. So we do have jurisdiction and standing because we're appealing— That's the administrative agency. Yes. It does provide for oppositions, absolutely, without some— but to try and understand the relief that you're requesting when you say you have no objection to their continuing to use the mark nationwide. Right. And there's—as I—if I recall correctly, every state has a state trademark. Well, I think every state, certainly the major states, which would nonetheless provide the same rights within the state that you say you're objecting to. But, Your Honor, they don't use the word by itself. I mean, what they've applied for with this trademark is a reach. So we have no objection to their selling Schlafly beer, Schlafly pale ale. They're products that have Schlafly in their name. But that's not what they're applying for. They're applying for Schlafly. It'd be as if they applied for a trademark in Stoll or Newman or Mayer. For the specified goods in which they have shown that it has been in use for 20 years. But their enforcement of that is not limited to their specified use. Those—that classification is just, you know, it's for, you know, education or whatever. They're not limited to their enforcement to those classifications. And I want to say that nearly everything my opposing counsel said here would apply to all these cases that involve surnames. It might apply to Earnhardt Collection five years from now or whatever. It certainly applied to the Olin Corporation. The Olin Corporation has been using Olin for 100 years. And Susan Hightower said, no, it's a surname. You cannot get a trademark in Olin because it's a surname. Olin Corporation is a publicly traded corporation. They've been using Olin for 100 years. She looked at it. She said, listen, that's a surname. You're not going to get the trademark in it. McDonald's. I believe there's a case that Susan Hightower cited about McDonald's where the board said you're not getting a trademark in McDonald's. McDonald's Corporation could not get a trademark in the word McDonald's. So Susan Hightower, you mean Judge Hightower? Yeah, she's on the board. Right. She wrote this Olin decision. And this is what we feel the board should have done in our case. This is the analysis that we feel the board should have done, and it didn't do. And we feel it was reversible error for the board to jump over the question of whether it's primarily merely a surname and go into this talk about how much they've spent. I mean, realize the beer industry is $200 billion, just in advertising industry. So all this talk, they're opposing counsel stuff here, and they've done this, and they spent a little bit here. Realize you've got to measure that against $200 billion. And it's nothing. It's nothing. I mean, in 10 years, nobody may even know that Schlafly's in the beer business, but they'll still have that trademark. If you grant them that trademark, they will have that trademark in Schlafly, and they can stamp out any use by anyone who's just in good faith going into business for themselves, opening a restaurant, donating to a library, whatever. They will have that trademark to come down hard on any other Schlafly who wants to use their surname. Thank you, Your Honor. Thank you. Thank you both. The case is taken under submission.